# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| AARON SHELLER, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No.  1:19-cv-4063 |
| v. | ) ) | JURY TRIAL DEMANDED |
| BAYER AG and MONSANTO COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Aaron Sheller, by and through his undersigned attorneys, complains of Defendants Bayer AG and Monsanto Company (collectively "Defendants"), based on the investigation of counsel, as follows:

## I.   INTRODUCTION

1.   Two million farms cover our American landscape, of which 98 percent are operated by families – individuals, family partnerships or family corporations. These Americans toil to produce 87 percent of United States agricultural products.

2.   American farmers have traditionally used Defendants' Roundup herbicide to treat the vast majority of corn, soybean and cotton acres planted in the United States due to its low cost and efficacy – without knowledge of the increased risk it causes for developing cancers, including non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

3.   Scientific evidence has established a clear association between glyphosate (the main ingredient in Roundup) and genotoxicity, inflammation, and an

increased risk of many cancers.

4.     Defendants knew or should have known that glyphosate is associated with an increased risk of developing cancer, including but not limited to non-Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcomas.

5.     Defendants failed to appropriately and adequately inform and warn Plaintiff and members of the Class of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup.

6.     In fact, Defendants have and continue to make broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt.

7.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff and members of the Class to purchase and increase the use of Defendants' Roundup for Defendants' pecuniary gain, and in fact, did induce Plaintiff to use Roundup.

8.     Defendants made these statements with complete disregard and reckless indifference to the safety of Plaintiff and members of the "Medical Monitoring Class" defined as:  "All persons who used Roundup[1] in the States of

---

[1] "Roundup" refers to all formulations of Defendants' Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready- to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass

Arizona, Arkansas, California, Colorado, District of Columbia, Florida, Illinois, Indiana, Maryland, Massachusetts, Missouri, Montana, New Jersey, Ohio, Pennsylvania, Utah and West Virginia for agricultural business or other commercial purposes."

9.     Accordingly, Plaintiff seeks equitable relief for himself and the Medical Monitoring Class in the form of medical monitoring as a result of their use of, and exposure to, Roundup which is causing them to be at increased risk for developing numerous forms of cancer, including but not limited to non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

## II.     JURISDICTION

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(1) as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

11.     Pursuant to 28 U.S.C. §1391(b), venue is proper in this district because a substantial part of the events giving rise to the claims occurred in this District.

## III.     PARTIES

12.     Plaintiff Aaron Sheller ("Sheller) is a resident of Hamilton County,

---

Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

Indiana and citizen of the United States.  Sheller is a partial owner of Sheller

Farms, LLC ("Sheller Farms"), an Indiana limited liability company.  As an owner

who works the acreage owned by Sheller Farms and other acreage for which Sheller

Farms is contracted to work, Sheller regularly participated in the spraying of 300 to

700 gallons of Roundup on approximately 1,000-3,000 acres of farmland twice per

year for 15 years.  Until in or about 2018, Sheller only wore gloves while spraying

Roundup but was not warned and did not know he should wear any other protective

gear.  Once he learned of the potential for causing cancer, in or about the spring of

2018, he began wearing respiratory gear and using charcoal filters. As a direct and

proximate result of being exposed to Roundup, Plaintiff Aaron Sheller is at an

increased risk for developing Non-Hodgkin's lymphoma and other illness.

13.     Defendant Bayer AG ("Bayer") is a German corporation with its

headquarters in Leverkusen, Germany.  Bayer purchased Monsanto in or about

2018. Since that time, Bayer has taken the position that its "risk assessment clearly

showed that, when used as directed, the products of Monsanto containing

glyphosate are safe. Based on the views held by regulatory authorities worldwide

and scientists, the board of management assessed the legal risks in connection with

the use of glyphosate as low."[2]

14.     Defendant Monsanto Company ("Monsanto") is a Delaware

corporation, registered to do business in Georgia and with a principal place of

business in St. Louis, Missouri, and with multiple business locations and facilities

---

[2] https://fortune.com/2019/03/30/bayer-monsanto-merger-roundup-cancer/ (last
accessed September 26, 2019).

operating in Indiana. Defendant is engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup. Defendant advertises and sells goods, specifically Roundup, in Indiana. Defendant transacted and conducted business within the State of Indiana that relates to the allegations in this Complaint.

15.     Defendants derived substantial revenue from goods and products used in the State of Indiana and nationwide. Defendants expected or should have expected its acts to have consequences within the State of Indiana, as well as nationwide, and derived substantial revenue from interstate commerce. Upon information and belief, Defendants did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

## IV.     FACTS

### A.  Background on Glyphosate and Roundup

16.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

17.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

18.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

19.     Sprayed as a liquid, plants absorb glyphosate directly through their

leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

20.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

21.     At all relevant times, Defendants was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup, in which the active ingredient is glyphosate.

22.     Defendants discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

23.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.

24.     For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

25.     Defendants are also intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009, Defendant Monsanto was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and

90% of soybean fields in the United States contained Roundup Ready® seeds.

## B. Registration of Herbicides Under Federal Law

26.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

27.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

28.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, considering the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

29.     The EPA and the State of Indiana registered Roundup for distribution,

sale, and manufacture in the United States and the State of Indiana.

30.    FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

31.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

32.    In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## C. Evidence of Carcinogenicity in Roundup

33.    As early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties.

34.    By way of example only, studies and scientific statements reflecting

the carcinogenicity of glyphosate include:

    a.  On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

    b.  In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All the data required was submitted and reviewed and/or waived.

    c.  In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

    d.  A 2006 study examining DNA damage in human subjects exposed to glyphosate produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used

during aerial spraying had a genotoxic effect on exposed

individuals;

35.    Glyphosate and Roundup have long been associated with carcinogenicity

and the development of numerous forms of cancer, including but not limited to non-

Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue

sarcoma.

36.    Numerous human and animal studies have evidenced the

carcinogenicity of glyphosate and/or Roundup, including but not limited to:

a.  In 1985, the EPA studied the effects of glyphosate in mice

finding a dose related response in male mice linked to renal

tubal adenomas, a rare tumor. The study concluded the

glyphosate was oncogenic;

b.  In 2003, scientists published the results of two case-controlled

studies on pesticides as a risk factor for non-Hodgkin's

lymphoma and hairy cell leukemia. The study concluded that

glyphosate had the most significant relationship to non-

Hodgkin's lymphoma among all herbicide studies with an

increased odds ratio of 3.11.

c.  A 2003 study examined the pooled data of mid-western farmers,

examining pesticides and herbicides as risk factors for non-

Hodgkin's lymphoma. The study, which controlled for potential

confounders, found a relationship between increased non-

10

Hodgkin's lymphoma incidence and glyphosate.

d. A 2008 population-based case-control study of exposure to various pesticides as a risk factor for non-Hodgkin's lymphoma strengthened previous associations between glyphosate and non-Hodgkin's lymphoma.

37.   In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants' Roundup products are more dangerous and toxic than glyphosate alone.

38.   As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone. By way of example only:

a. A 1997 study entitled "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay" found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals;

b. A 2002 study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation" found that Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles;

c. A 2004 study entitled "Glyphosate-based pesticides affect cell

11

cycle regulation" demonstrated a molecular link between
glyphosate-based products and cell cycle dysregulation, which "is
a hallmark of tumor cells and human cancer.";

    d.   A 2005 study showed that Roundup's effects on rat liver
mitochondria are much more toxic and harmful than the same
concentrations of glyphosate alone, which could be the result of
other chemicals in Roundup, namely the surfactant POEA, or
alternatively due to the possible synergy between glyphosate
and Roundup formulation products;

    e.   A 2009 study examined the effects of Roundup and glyphosate on
human umbilical, embryonic, and placental cells, which
concluded that supposed "inert" ingredients, and possibly POEA,
change human cell permeability and amplify toxicity of
glyphosate alone. The study confirmed that the adjuvants in
Roundup are not inert and that Roundup is always more toxic
than its active ingredient glyphosate.

39.    The results of these studies were confirmed in recently published peer-reviewed studies and were always available and/or known to Defendants.

40.    Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff and members of the Class from Roundup.

41.     Defendants knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

42.     Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup.

43.     Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Plaintiffs and the members of the Class.

44.     Despite knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

### D. IARC Classification of Glyphosate

45.     The World Health Organization ("WHO") of the United Nations International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency tasked with conducting and coordinating research into the causes of cancer.

46.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

47.     IARC set glyphosate for review in 2015-2016.  IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

48.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

49.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity[3] and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

50.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("non-Hodgkin's lymphoma") and several

---

[3] Genotoxicity refers to chemical agents that can damage the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

subtypes of non-Hodgkin's lymphoma, and the increased risk continued after adjustment for other pesticides.

51.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

### E. Scientific Fraud Underlying the Safety Determinations of Glyphosate

52.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

53.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

54.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

55.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

56.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

15

57.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

58.     Three top executives of IBT were convicted of fraud in 1983.

59.     In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

60.     In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

61.     The investigation lead to the indictments of the laboratory owner and a handful of employees.

### F.  Monsanto's False Representations Regarding the Safety of Roundup®

62.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. The

16

representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup include but are not limited to:

    a. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

    b. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

    c. Roundup biodegrades into naturally occurring elements.

    d. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

    e. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

    f. You can apply Accord with "confidence because it will stay where you put it" [;] it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

    g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

63.    On November 19, 1996, Monsanto entered an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b. its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c. its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

64.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

65.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

66.    In spite of its knowledge, Defendants continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

67.    Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff and members of the Class to purchase and increase the use of Defendants' Roundup for Defendants' pecuniary gain, and in fact, did induce Plaintiff to use Roundup.

68.    Defendants made these statements with complete disregard and

reckless indifference to the safety of Plaintiff and members of the Class.

69.     Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including but not limited to non-Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

70.     Defendants knew or should have known that glyphosate is associated with an increased risk of developing cancer, including but not limited to non-Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcomas.

71.     Defendants failed to appropriately and adequately inform and warn Plaintiff and members of the Class of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing  non-Hodgkin's lymphoma, as well as other severe and personal injuries.

72.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continues to maintain that glyphosate and/or Roundup is safe, non- carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

73.     Defendants have claimed and continue to claim that Roundup is safe, non- carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendants' cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiffs.

74. Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

75. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

76. Glyphosate, and Defendants' Roundup products, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

77. Defendants' statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff and the Class.

78. Despite Defendants' knowledge that Roundup was associated with an elevated risk of developing cancer, Defendants' promotional campaigns focused on Roundup's purported "safety profile."

79. Defendants' failure to adequately warn Plaintiff resulted in (a) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (b) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including non-Hodgkin's lymphoma, and other injuries associated with Roundup.

80.     Defendants failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

81.     The failure of Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

82.     The failure of Defendants to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

83.     The failure of Defendants to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

84.     By reason of the foregoing acts and omissions, Plaintiff seeks equitable relief for himself and the Class in the form of medical monitoring as a result of their use of, and exposure to, Roundup which is a substantial contributing risk factor causing them to be at increased risk for developing numerous forms of cancer, including but not limited to non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

## V.     EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

85.     The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff and Class

members the true risks associated with Roundup and glyphosate.

86.     At all relevant times, Defendants have maintained that Roundup is safe, non-toxic, and non-carcinogenic.

87.     Indeed, even as of July 2016, Defendants continued to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long- term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).

88.     As a result of Defendants' actions, Plaintiffs was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiffs to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

89.     Furthermore, Defendants is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendants was under a duty to disclose the true character, quality, and nature of Roundup because this was non- public information over which Defendants had and continues to have exclusive control, and because Defendants knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendants is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

90.     Plaintiff had no knowledge that Defendants was engaged in the

wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendants' representations. Accordingly, Defendants is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## VI.   CLASS ALLEGATIONS

91.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of himself and all others similarly situated as members of the following "Medical Monitoring Class":  "All persons who used Roundup in the States of Arizona, Arkansas, California, Colorado, District of Columbia, Florida, Illinois, Indiana, Maryland, Massachusetts, Missouri, Montana, New Jersey, Ohio, Pennsylvania, Utah and West Virginia for agricultural business or other commercial purposes."

92.    Specifically excluded from the proposed Classes are Defendant, any of its past, present or future officers, directors, trustees, agents, representatives, employees, principals, trusts, partners, joint ventures or controlled entities; any

successors, assigns, heirs or other persons or entities related to or affiliated with

Defendants; the Judge assigned to this action; and any member of the Judge's

immediate family.

93.     *Numerosity.* The members of the Classes are so numerous as to render

their individual joinder impracticable. Although the precise number of Class

members is unknown, based upon information and belief Plaintiff alleges that the

Class contains millions of members.

94.     Class Members may be notified of the pendency of this action through

electronic mail, first class mail and/or by published notice.

95.     *Existence and Predominance of Common Questions of Law and Fact.*

Common questions of law and fact applicable to all members of the Class

predominate over any questions affecting only individual Class members. These

common legal and factual questions include, but are not limited to, the following:

> a.  Whether Defendants had a duty to exercise reasonable care in
>     the designing, researching, testing, manufacturing, marketing,
>     supplying, promoting, packaging, sale, and/or distribution of
>     Roundup, including a duty to assure that the product would not
>     cause users an increased risk of suffering unreasonable,
>     dangerous side effects;
>
> b.  Whether Defendants failed to exercise ordinary care in the
>     designing, researching, testing, manufacturing, marketing,
>     supplying, promoting, packaging, sale, testing, quality assurance,

quality control, and/or distribution of Roundup;

c.  Whether Defendants knew or should have known that using Roundup created a high and increased risk of numerous forms of cancer, including but not limited to non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

d.  Whether Defendants was negligent in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup;

e.  Whether exposure to Roundup placed Plaintiff and Class members at increased risk for Non-Hodgkins lymphoma and other health problems;

f.  Whether the Medical Monitoring States recognize medical monitoring as a remedy for negligence or an independent cause of action;

g.  Whether Plaintiff or Class Members are entitled to medical monitoring.

96.  *Typicality.* Plaintiff's claims are typical of those held by the other members of the Class in that each of them was exposed to Roundup during their use of Roundup for farming or commercial business.

97.  *Adequacy of Representation.* Plaintiff will fairly and adequately

protect the interests of the Class. Plaintiff has retained trial counsel highly experienced in complex litigation including complex class action litigation seeking medical monitoring, and Plaintiff intends to vigorously prosecute this action. Plaintiff has no interests in this action that are adverse or antagonistic to the interests of the Class.

98.   *Superiority.* Class action litigation is superior to all other available means for the fair and efficient adjudication of this controversy. While each Class member has a present need for medical monitoring, the burden and expense that would be entailed by individual prosecution of their claims against Defendants would make individual litigation cost prohibitive.

99.   It would thus be practically impossible for the members of the Class, on an individualized basis, to effectively seek and obtain redress for the wrongs committed against them. In addition, even if the Class members could —and realistically would be willing—to pursue such individualized litigation, this Court likely could not reasonably sustain the imposition on resources that individualized litigation over this controversy would entail.

100.   Further, individualized litigation would create the danger of inconsistent or contradictory judgments arising from the identical factual predicate.

101.   Individualized litigation would also result in a substantial increase in the time and expense required of the parties and the Court to address the issues raised by this litigation.

102.   By contrast, litigation of the controversy outlined herein as a class

action provides the benefits of adjudication of these issues in a single, unitary proceeding, provides substantial economies of scale, allows comprehensive supervision of the legal and factual issues raised herein by a single court, and presents no unusual management difficulties under the circumstances presented here.

**CAUSES OF ACTION**
**COUNT I**
**<u>NEGLIGENCE</u>**

103.    Plaintiff repeats and realleges the foregoing allegations on behalf of himself and the Medical Monitoring Class as if fully set forth herein.

104.    Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

105.    Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendants knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of non-Hodgkin's lymphoma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong

medical treatment, monitoring, and/or medications.

106.   The negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

    a.  Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

    b.  Failing to adequately and correctly warn Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

    c.  Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

    d.  Representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

    e.  Representing that Roundup had equivalent safety and efficacy as other forms of herbicides; and

    f.  Concealing information from the Plaintiffs while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations.

107.   Defendants under-reported, underestimated, and downplayed the serious dangers of Roundup.

108.   Defendants negligently and deceptively compared the safety risks

and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

109. Defendants was negligent and/or violated the Medical Monitoring States' laws in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

    a. Failed to use ordinary care in designing and manufacturing Roundup to avoid the risks to individuals when Roundup was used as an herbicide;

    b. Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

    c. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup; and

    d. Was otherwise careless and/or negligent.

110. Even though Defendants knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Class.

111. Defendants knew or should have known that Class members would be at increased risk of developing numerous forms of cancer, including but not limited to non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft

tissue sarcoma, and be in need of medical monitoring as a result of Defendants' failure to exercise ordinary care, as set forth above.

112.   Defendants' violations of law and/or negligence are the proximate cause of Plaintiff's and the Class's need for medical monitoring.

## VII.   PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs and the members of the Classes pray for judgment against Defendant, as follows:

(a) Certifying the Medical Monitoring Class and appointing Plaintiff as Class Representative and his counsel as Class Counsel;

(b) Finding against Defendants on liability;

(c) Awarding Plaintiff and the Class the costs of medical monitoring;

(d) Awarding reasonable attorneys' fees and costs incurred in prosecuting this action, and for future oversight of a medical monitoring program;

(e) Such other and further relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated:        September 30, 2019

AARON SHELLER, individually and on behalf of all others similarly situated,


By: */s/ William* N. Riley
       William Riley
       Anne Medlin Lowe
       RILEY WILLIAMS & PIATT, LLC
       301 Massachusetts Ave.
       Indianapolis, IN 46204
       Ph: 317-633-5270

wriley@rwp-law.com
alowe@rwp-law.com

Elizabeth A. Fegan
Timothy A. Scott
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
beth@hbsslaw.com
tim@feganscott.com

Lynn Ellenberger
FEGAN SCOTT LLC
500 Grant St., Ste. 2900
Pittsburgh, PA 15219
Ph: 412.515.1529
lynn@feganscott.com

J. Barton Goplerud
SHINDLER, ANDERSON, GOPLERUD
& WEESE, P.C.,
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
Ph. 515.223.4567
goplerud@sagwlaw.com

Russel Cate
CATE, TERRY & GOOKINS LLC
301 East Carmel Drive, Suite C300
Carmel, Indiana 46032
Ph: 317.564-0016
rcate@ctglaw.com

Counsel for Plaintiff